BROWN, Judge.
The Chief of Police for the City of Winn-field appeals the district court’s judgment upholding his dismissal by the City’s Board of Aldermen. For the following reasons, we reverse.

FACTS

The Mayor of the City of Winnfield, with the approval of the Board of Aldermen, appointed Cranford L. Jordan, Jr., Chief of Police in 1979. Jordan served continuously as chief, without disciplinary incident, until his firing by the Board of Aldermen in March of 1992. He served under two different mayors. The events leading to the action by the Board of Aldermen arose out of the execution of a search warrant.
The police department had received complaints that alcohol was being sold illegally out of the Gertie Lee Richardson residence located at 709 Lucky Street in Winnfield, Louisiana. Gertie Richardson was a notorious and self-proclaimed “bootlegger” who had been arrested over a dozen times on alcohol-related charges. Based on a controlled purchase of alcohol by an undercover officer, a search warrant was obtained by the Winnfield Police Department. Pursuant to this warrant, which authorized a search for alcoholic beverages, controlled dangerous substances and drug paraphernalia, the Richardson residence was searched on September 29, 1990. (emphasis added)
Chief Jordan supervised the search, which resulted in the seizure of massive amounts of alcohol, over $6,000.00 in cash, two guns and suspected drug paraphernalia. A package of flour left on a table in the living room by the Richardsons was emptied onto the table by Chief Jordan during the search to check for drugs; some of the flour spilled onto the floor. A carton of eggs also left on the same table was apparently knocked to the floor. It is not known who may have been responsible. After viewing the video, it appears that the eggs were accidentally broken. Some canned goods were knocked to the floor of the kitchen. A few packages of potato chips and candy were also on the floor. Dresser drawers were intentionally emptied onto the bed and sofa, which procedure is normal for any police search. Because no one was home at the time of the search, doors were forced open.
Upon returning to town, the Richardsons videotaped the house, contacted an attorney and immediately filed a civil suit against the City of Winnfield and the Winnfield Police Department.[1] Thereafter, Gertie Lee Richardson pled guilty to criminal charges stemming from evidence seized in the search. Despite the filing of the civil lawsuit against the city, no disciplinary inquiry was made into Chief Jordan’s actions in connection with the search until approximately 14 months later.
*59 Chief Jordan had imposed a seven day suspension on Sonny Roberts, a Winnfield police officer, in an unrelated matter. Officer Roberts wrote a letter to the Winnfield Fire & Police Civil Service Board (“Civil Service Board”), dated November 14, 1991, appealing his seven day suspension. In this letter, Officer Roberts complained that if he were to be disciplined for his conduct, then Chief Jordan should likewise be disciplined for “conduct unbecoming an officer” in connection with the search of the Gertie Lee Richardson residence on September 30, 1990 (the actual date of the search was September 29, 1990).
Following receipt of the complaint, an investigation was begun by the Civil Service Board. On February 1, 1992, Chief Jordan was served with notice that a hearing would be held concerning the investigation. This heating was contrary to the wishes of the mayor, who was the appointing authority for the nonelected chief of police.[2]
The hearing was conducted on March 12 & 13, 1992. A majority of the Civil Service Board found that Chief Jordan’s actions in connection with the search of the Richardson residence constituted improper conduct. Specifically, they found the following acts of misconduct: (1) failure to have the residence properly secured and leave an officer in charge until the owners returned; and (2) the condition of the residence after the search and seizure. They also found that Jordan violated standards (A)(1) and (A)(5) set forth in LSA-R.S. 33:2560 and that there was a real and substantial relationship between the improper conduct and the efficient operation of the Winnfield City Police Department as a public service. They further found that Jordan’s conduct impaired the efficiency and orderly operation of the police department as a public service. Disciplinary action was found to be warranted and the Civil Service Board ordered the appointing authority to terminate Jordan within 15 days.
Chief Jordan filed an appeal with the district cotut seeking review of the Civil Service Board’s, decision of March 13, 1992. The Board of Aldermen, however, held a meeting on March 24, 1992, and voted to terminate the employment of Chief Jordan. The mayor did not participate in that decision.
Chief Jordan then appealed his termination by the Board of Aldermen back to the Civil Service Board. At a hearing on May 6, 1992, the Civil Service Board upheld Chief Jordan’s discharge. A second appeal was filed in district court seeking review of the Civil Service Board’s decision of May 6,1992.
After oral argument, briefs and consideration of the record of the Civil Service Board hearing, the district court rendered judgment on January 6, 1993. The district court found that the Civil Service Board’s first finding of alleged misconduct (failure to properly secure the Richardson residence and leave an officer on the premises) was clearly wrong. In all other respects, the district court upheld the firing.
Chief Jordan appeals, asserting several assignments of error.

DISCUSSION

Appellant argues that the proper procedure for removal of a nonelected chief of police, which is set forth in LSA-R.S. 33:404, was not followed and thus his termination is without legal effect.
At the time Chief Jordan was terminated, the office of the Chief of Police of the City of Winnfield was an appointed position filled by the mayor with the approval of the Board of Aldermen. LSA-R.S. 33:381(C).[3] LSA-R.S. 33:362(A)(1) provides that the legislative powers of a municipality are vested in and exercised by the board of aldermen. Subsection (B) provides that the mayor is the chief executive officer of the municipality.
LSA-R.S. 33:404(A) provides in part:
*60 The mayor shall have the following powers, duties and responsibilities:
(1) To supervise and direct the administration and operation of all municipal departments, offices, and agencies, ...
(3) Subject to applicable state law, ordinance, and civil service rules and regulations, to appoint and remove municipal employees, other than the employees of a police department with an elected chief of police. However, appointment or removal of a nonelected chief of police, ... shall be subject to approval by the board of aider-men, except that in the case of tie vote, the recommendation of the mayor shall prevail. (Emphasis added).
The Civil Service Board voted on March 13, 1992, to order the appointing authority to terminate Chief Jordan within fifteen days. On March 24, 1992, the Board of Aldermen met and voted unanimously to terminate appellant as ordered by the Civil Service Board. The record reflects that the mayor took no part in these proceedings.
The district court found that the mayor’s concurrence or recommendation was not required for the removal of appellant, a non-elected chief of police, citing LSA-R.S. 33:362(A)(1) as authority for its conclusion that the removal of Chief Jordan was within the board’s legislative and inherent powers. We cannot agree with this line of reasoning in light of the clear import of LSA-R.S. 33:404(A)(3) and Bourgere v. Anzelmo, 517 So.2d 1121 (La.App. 5th Cir.1987).
In Bourgere, supra, the court addressed the legal efficacy of an ordinance giving the board of aldermen the final say in the hiring or firing of municipal employees and held that the ordinance conflicted with the statute giving the mayor the day-to-day responsibility for administering municipal government. As found by the Fifth Circuit:
Under § 404(A)(3), the mayor, subject to ordinance, has the power, duty, and responsibility “to appoint and remove municipal employees, other than the employees of a police department with an elected chief of police.” It reasonably follows that the mayor, as chief executive officer, is intended to have the day-to-day charge of administering municipal government. This charge encompasses the right to hire and to fire municipal employees, subject to the “policies and procedures” promulgated by the board of aldermen, the “legislative body” (La.R.S. 33:362(A)(1)) charged with directing municipal policy. This duty to enact policies and procedures does not extend to the right to make individual decisions. Only at the officer level — a more policy-directed level — are the aldermen empowered to participate in individual selections, and, even then, they must act in collaboration with the mayor.
Bourgere, 517 So.2d at 1124.
LSA-R.S. 33:362 envisions a division of municipal powers and responsibilities between the board of aldermen, who is vested with legislative authority, and the mayor, who is the municipality’s executive officer. LSA-R.S. 33:362(A)(2) sets forth the specific legislative powers of the board of aldermen, which are the enactment and enforcement of city ordinances. Not only is the removal of a nonelected chief of police not a legislative power, it is a duty specifically delegated to the mayor by LSA-R.S. 33:404(A)(3). We note, however, that the mayor’s decision regarding the removal of a nonelected police chief is subject to the approval of the board of aldermen, though in a tie situation, the mayor’s recommendation prevails.
There are other specific examples of situations where the legislature contemplated a sharing of municipal powers. See, for example, LSA-R.S. 33:362(C) (creation, abolition, merger or consolidation of municipal departments — board of aldermen acting upon written recommendation of the mayor); LSA-R.S. 33:383(C) (filling of vacancy in municipal offices — mayor and board acting together); LSA-R.S. 33:386(A) (appointment of municipal employees whose election is not provided for by statute — mayor, subject to confirmation by the board); and LSA-R.S. 33:406 (enactment of ordinances — collaboration).
In each of these specific situations, the legislature has carefully delineated the role to be played by the mayor and the board of aldermen. In the instant case, the mayor did not take any part in the Board of Aldermen’s *61 unilateral implementation of the Civil Service Board’s mandate to terminate Chief Jordan. The Board of Aldermen is not empowered to act alone in removing a nonelected chief of police. Thus, the decision of the district court upholding Chief Jordan’s termination must be reversed.[4] Accordingly, appellant, Cranford Jordan, is ordered reinstated to the City of Winnfield Police Department, with full benefits and back pay beginning from the date of his termination.
REVERSED and RENDERED.
HIGHTOWER, J., concurs.

. The Richardsons' lawsuit against the city and police department has gone to trial and is currently under advisement.

. The record contains a copy of a letter from Mayor Henderson to the Civil Service Board prior to its investigation and hearing, in which the mayor requested that the board defer acting upon Officer Roberts’ complaint until the civil action against the city and police department had been decided. It was the mayor's intent to await the court’s determination of civil liability prior to imposing any type of disciplinary action, which, depending on the outcome of the civil litigation, might even be unwarranted.'

. Winnfield now has an elected chief of police. Acts 1992, No. 739, amending LSA-R.S. 33:381.

. Though we do not reach appellant’s other arguments, this writer notes that the only specific allegations of misconduct against Chief Jordan were made by Officers Roberts and Nugent. Both Roberts and Nugent had been disciplined on other matters by Chief Jordan. Because neither participated in the actual search, they claimed only to have personally witnessed Chief Jordan throwing potato chips or candy about the house. Chief Jordan and the other members of the search team denied these allegations.